## IN THE UNITED STATES DISTRIC COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **WANDA ÁLVAREZ de MÉNDEZ,**<br><br>**PLAINTIFF**<br><br>    **V.**<br><br>**AMERICA CRUISE FERRIES, INC.; BAJA FERRIES USA; BAJA FERRIES S.A. de C.V.; STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD; THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA); THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED; JOHN DOE; INSURANCE COMPANY X; INSURANCE COMPANY Y; INSURANCE COMPANY Z,**<br><br>  **DEFENDANTS** | **CIVIL NO.**<br><br><br>**ACTION FOR DAMAGES IN TORT AND UNDER MARITIME LAW**<br><br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

## COMPLAINT

**NOW COMES** Plaintiff Wanda Álvarez de Méndez, through her undersigned attorneys, and very respectfully states, alleges and prays as follows:

**I.**    **Nature of Action**

1. This is a tort and maritime liability action in which Plaintiff requests redress for the physical and emotional injuries, definite nervous disorder, physical consequences and other damages sustained by her as a result of an accident in which Plaintiff Wanda Álvarez de Méndez was severely injured.  Plaintiff alleges that, as a result thereof, all of the Defendants are jointly and severally liable under Article 1802 of the Puerto Rico Civil Code and under 28

USC §1333 (1970), federal maritime law. See also, *Victory Carriers, Inc. vs. Law*, 404 US 202, 204 92S. ct 418, 30 LED 2d 383 (1971).

2. The damages more fully described below were caused by one or all of the Defendants when, due to lack of adequate maintenance or proper mechanical care, a fire arose on The M/V Caribbean Fantasy while the Plaintiff was on board.  Under Maritime Law and Puerto Rio law, both the owner and operator of the vessel at the moment of the accident, as well as their insurers, are jointly and severally liable to Plaintiff for their negligence.  The combined negligence of the Defendants caused Plaintiff to brake her leg and suffer multiple body trauma, mental anguish, anxiety and other damages claimed herein.

## II.    PARTIES

3.    Plaintiff **Wanda Álvarez de Méndez** ("Wanda" or "Álvarez") is and was, at all relevant times, of legal age, resident of Santo Domingo, Dominican Republic, and a citizen of said country.

4.    Defendant **AMERICA CRUISE FERRIES, INC.** (herein "ACF") is a corporation organized by the state of Puerto Rico or in a state other than the Dominican Republic with principal place of business in Concordia 249, Mayaguez, PR 00680. Its Resident Agent is Néstor González García, located at Concordia 249, Mayaguez, PR 00680.

5.    ACF is and was at all times relevant hereto the owner or operator of The M/V Caribbean Fantasy ("The Ferry"), a sea going vessel which made regular oceangoing trips to Santo Domingo from San Juan, Puerto Rico.

6.    Defendant **BAJA FERRIES USA** (herein "BAJA FERRIES USA") is a corporation organized under the laws of a State of the United States or of a state other than the Dominican Republic with principal place of business at the following location: 2601 S

Bayshore Dr.  # 1110, Miami, FL 33133, USA.

7.      Defendant **BAJA FERRIES S.A. de C.V.** (herein "BAJA FERRIES S.A.") is a corporation organized under the laws of Mexico or of a state other than Dominican Republic with principal place of business at the following location: Ignacio Allende 1025, Zona Central, 23000 La Paz, B.C.S., Mexico.

8.      Baja Ferries USA and Baja Ferries S. A. are and were at all times relevant hereto the owners or operators of The M/V Caribbean Fantasy ("The Ferry").

9.      Codefendant **STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD** [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the motor vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which would cover liabilities and personal injuries occasioned to persons aboard the vessel **Caribbean Fantasy.** Steamship Mutual Management (Bermuda) Ltd.'s principal place of business is as follows: "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

10.      Codefendant **THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA)** [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the motor vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessel, and specifically, which would cover liabilities and personal injuries occasioned

to persons aboard the vessel **Caribbean Fantasy.** Said codefendant's principal place of business is as follows: "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

11.     Codefendant **THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the motor vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessel, and specifically, which would cover liabilities and personal injuries occasioned to persons aboard the vessel **Caribbean Fantasy.** Said codefendant's principal place of business is as follows: "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda.

12.     Defendant John Doe is an individual or entity domiciled in or incorporated and with principal place of business in the Commonwealth of Puerto Rico, or a country other than Dominican Republic, who is also liable to the Plaintiff.

13.     Defendants Insurance Company X, Insurance Company Y and Insurance Company Z are insurance companies duly organized and existing under the laws of the Commonwealth of Puerto Rico or a country other than the Dominican Republic, that issued a policy of insurance covering the facts of this case on behalf of Defendants Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF or John Doe.

## III.     JURISDICTION

14.     This court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1332, since there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of costs and interests.

15. Alternatively, this case is governed by federal maritime law under 28 USC §1333 (1970); *Victory Carriers, Inc. vs. Law*, 404 US 202, 204 92S. ct. 418, 30 LED 2d 383 (1971). Even though general maritime law principles govern liability in an admiralty action, however, state law may supplement damages. *Moragne v. State Marine Lines, Inc.,* 398 US 375, 26 L. Ed. 2d. 239 (1970).

16. Venue is proper in the District of Puerto Rico pursuant to 28 U.S.C. § 1391, since the events that gave rise to this cause of action occurred in the District of Puerto Rico and because one or more of the Defendants reside in this judicial district and the sea going vessel sailed from the Port of Santo Domingo, Dominican Republic, to the Port of San Juan, Puerto Rico.

IV. **FACTS**

17. On August 16, 2016, Plaintiff Álvarez boarded the M/V Caribbean Fantasy for a voyage from the Dominican Republic to Puerto Rico. The M/V Caribbean Fantasy was scheduled to dock in the Port of San Juan. Ms. Álvarez boarded the ship that day in the afternoon to visit his brother. Ms. Álvarez bought a round-trip ticket which cost her $165.48.

18. At around 7:00 am the next morning, the captain announced over the loudspeaker that breakfast was available for passengers. Ms. Álvarez went to the cafeteria for coffee. However, in the course of moving to the cafeteria she realized that there was smoke in the opposite aisle. At that precise time the captain informed through the speaker that there was a fire that could not be extinguished and that everyone had to disembark.

19. Immediately, Ms. Álvarez went up to the deck and realized that the crew were getting lifejackets. As she was among the first to climb they gave her and all others lifejackets and ordered that they be put-on. At that time Ms. Álvarez was very tense but said nothing.

5

20.     The crew told the passengers that they could not have phones or call relatives and began to accommodate ranks of women and men. Children and the elderly would be the first to be evacuated. Then they moved the line of women and men to the other side of the boat near the chimney where the smoke was coming out. At that time one of the lifeboats filled with children stuck because the lines were not running through the pulleys on the scaffold. It veered and all who were inside were screaming, scared and desperate.

21.     Ms. Álvarez began to be affected due to inhalation of smoke emanating from the boat.  Because she suffers from a respiratory condition he had *salbutamol* in her pocket and proceeded to take it.

22.     Minutes later a crew member ordered a group of people down a slide. Wanda proceeded to jump. The slide was bent in the middle.  Ms. Álvarez felt the slide was not inflated to capacity, so people were entangled in the middle of the slide.

23.     Ms. Álvarez remained entangled in the part of the slide that was bent. Her right leg was caught in the part of the slide that was bent. A crewman hurried Ms. Álvarez to get off the slide as fast as she could. Ms. Álvarez tried to push with her hands and the crewman began to pull her left leg. While that happened, her upper body was hunched forward and her right leg was tangled behind. When she finally went down the slide, Ms. Álvarez could tell that her right leg was not normal. Ms. Álvarez asked a crewman to straighten her leg and the crewmen abide. When the crewman asked Wanda to go to the lifeboat that would take her to port, people had to carry her because she could not move her leg. Her leg was broken.

24.     Ms. Álvarez noted that there were three other people with a broken leg. When they reach the lifeboat, Ms. Álvarez began experiencing excruciating leg pain, vomiting and dizziness.

25.     While Ms. Álvarez was waiting in the lifeboat an explosion occurred and everyone on the boat was shocked because the lifeboat was too close to the Ferry. After a long time waiting a boat approached, but Ms. Álvarez had to wait for children and the elderly to go out first. When her turn came she had to crawl to board the boat. A crew member grabbed her by the back of her pants and hips and pulled her in. She found all those on board vomiting.

26.     Ms. Álvarez began to lose consciousness. A woman, unknown to Ms. Álvarez, gave her water with menthol to not lose consciousness. On the boat there was a veterinarian who checked her leg and told her it was swollen. A crew member said it would take 10 minutes to reach port.

27.     They reached port and paramedics arrived. They rode her on a stretcher and proceeded to place the identification band on her arm. She was diagnosed with high blood pressure and leg injury and was transported to the P.R. Medical Center. She remained there because her pressure will not go down and was being monitored.

28.     The doctors informed Ms. Álvarez that she had to go to the orthopedics department to treat her leg injury.  She proceeded to the orthopedics department, but there she was told that she needed authorization from the ferry to be given medical treatment.  An operation was needed to be done.

29.     Ms. Méndez's trip to Puerto Rico, had been scheduled as a vacation, which was ruined by the ordeal of August 17, 2016, coupled with the fact that she had to spent many days without clothes, as all of her luggage with her personal items remained on board the M/V Caribbean Fantasy.

30.     At present, Ms. Méndez continues with pain throughout her body, difficulty breathing and symptoms akin to post traumatic stress disorder, such as nightmares, fear of the

sea, anxiety, etc.

31.    In all, Ms. Méndez will require extensive medical treatment in the future as a result of the physical and psychological damages suffered as a consequence of the catastrophe on board the M/V Caribbean Fantasy on August 17, 2016.

**V.    LIABILITY**

### A.  FIRST CAUSE OF ACTION - NEGLIGENCE

32.    About a month prior to August 17, 2016, the M/V Caribbean Fantasy underwent extensive repair work in the Port of Tunis, Tunisia, which included extensive work in her engines, as well as other appurtenances.

33.    After concluding the work, the M/V Caribbean Fantasy continued from the Port of Tunis to the Port of Gibraltar for refueling, prior to continuing across the Atlantic to Puerto Rico. However, the M/V Caribbean Fantasy was unable to immediately leave the Port of Gibraltar, as her engines failed and had to undergo further repairs.

34.    After the repairs were done at the Port of Gibraltar, M/V Caribbean Fantasy proceed to the Port of San Juan, Puerto Rico. However, during the voyage crossing the Atlantic Ocean, its engines failed once again and the M/V Caribbean Fantasy was adrift for a whole day in the middle of the ocean.

35.    As a result of the second engine mishap in the Atlantic Ocean, the crew were able to start one of the M/V Caribbean Fantasy's engines and had to change course to the Port of Santo Domingo, Dominican Republic, since the authorities do not allow a vessel such as the M/V Caribbean Fantasy to enter the Port of San Juan with just one engine.

36.    In the Port of Santo Domingo, the M/V Caribbean Fantasy underwent further engine repairs, before proceeding to the Port of San Juan with its two (2) engines.

37.   While at the Port of San Juan, the M/V Caribbean Fantasy underwent the necessary trials and inspections. In order to renew its Coast Guard license, the vessel appurtenances and crew were inspected and tested. However, out of the three tenders that the vessel possessed, only one was working. During the emergency of August 17, 2016, when the tenders of the M/V Caribbean Fantasy were used, only one worked properly, as the other two (2) failed to work. One of them got stuck in the ropes while being lowered, and after hours of waiting in despair in it, the passengers on board had to be transferred to another vessel for transport to shore. The third tender, after initially getting stuck in the ropes while being lowered, once it finally was placed in the ocean, its engine failed and was adrift in the ocean for some hours before the passengers inside it were rescued by other vessels.

38.   In addition, on the evening of the date of the events, passengers reported that the air conditioner inside the cabins was not working, and never worked. This, a further indication that something was wrong with mechanical and/or electrical appurtenances of the M/V Caribbean Fantasy.

39.   Finally, it was evident by the despair and chaos that ensued as soon as the abandon-ship was ordered, that the crew of the M/V Caribbean Fantasy had not been properly trained in emergency and evacuation procedures.

40.   In all, as a result of the defective engines, of which defendants had ample notice prior to August 17, 2016, the fact that only one of the three tenders of the vessel were working and the fact that its crew had not been properly trained in emergency evacuation procedures, the M/V Caribbean Fantasy was rendered unseaworthy.

41.   Defendants were negligent in the maintenance provided to the M/V Caribbean Fantasy, particularly as it pertains to its engines and other appurtenances, such as its emergency

tenders, as well as in the repairs conducted on its engines.

42.   It was totally irresponsible and negligent for the Defendants to operate the vessel on August 16 and 17, 2016, knowing or having sufficient reasons to know that the M/V Caribbean Fantasy was unseaworthy as a result of its defective engines, defective emergency tenders, defective emergency equipment, deficient emergency procedures and deficient training of its crew in emergency and evacuation procedures. Because of that, Defendants are liable to plaintiff for all of her damages.

43.   Defendants, owners or operators of the M/V CARIBBEAN FANTASY, were negligent and breached their duty of care towards plaintiff, inasmuch as they failed to properly maintain the vessel seaworthy and safe from dangerous conditions, resulting in the onboard fire that caused plaintiff the damages alleged herein.

44.   Defendants knew about the mechanical and electrical failures of the M/V CARIBBEAN FANTASY vessel immediately prior to the incidents alleged in this complaint. However, they acted with reckless disregard for the passenger's safety, omitting and failing to do the proper maintenance and repairs to prevent the events herein alleged.

45.   Defendants were also negligent by breaching their duty of care towards Plaintiff and acting with reckless disregard for the passenger's safety, inasmuch as they failed to properly maintain the vessel's lifeboats, emergency slides and other safety equipment in proper working condition, resulting in unnecessary delays in the evacuation of Plaintiff and other passengers contributing to the damages alleged in this complaint.

46.   Defendants were also negligent by breaching their duty of care towards Plaintiff and acting with reckless disregard for the passenger's safety, inasmuch as they failed to properly train the vessel's crew in emergency procedures, resulting in unnecessary delays in the evacuation of Plaintiff and other passengers contributing to the damages alleged in this complaint.

47.     Defendants were also negligent by breaking their duty to provide passengers with safe ingress and egress to and from the ship and by creating an unsafe or foreseeable dangerous condition that was under the exclusive control of the defendant.

48.     Defendants acted with total disregard for passengers' - such as Plaintiff - safety by operating the vessel M/V CARIBBEAN FANTASY on August 16 and 17, 2016, knowing the unseaworthiness of such vessel due to electrical and mechanical malfunctions and failures. Under Articles 1802 and 1803 of the Civil Code of Puerto Rico, defendants are jointly and severally liable for all damages suffered by Plaintiff as a direct result of the defendants' negligence.

49.     Furthermore, as discovered by way of attorney work product through the public allegations contained in at least one of the many other Complaints filed thus far stemming from the same incident (i.e. USDCPR Case 3:16-cv-02615-FAB):

a. The Ferry was built in 1989 in Japan, and is Baja Ferries' property.

b. The Ferry's flag is from Panamá.

c. The Ferry does commercial activities between Dominican Republic and Puerto Rico such as ferrying passengers.

d. Between 2011 and 2015, the US Coast Guard found at least 107 security deficiencies, most of the them (approximately 44) related to the fire system. Some of those deficiencies were related to the incorrect operating of the fire screen doors, which usually were not able to be closed and/or were reported as opened when they were closed.

e. On an October 16, 2014, inspection made by the USCG stated that the "inflatable life rafts used in conjunction with MES shall comply with the requirements of Section 4-2. The life rafts 4, 13, 17,18 &24 were found with the painter lines falling off the life raft line storage pockets".

g. A January 2015 inspection made by the United States Coast Guard stated that oil fuel lines should be screened or protected in some way to avoid any pray or leakage onto ignition sources.

h. Specifically in April 17, 2015, the USCG stated that the "fire screen doors shall be capable of closing at an angle of inclination of up to 3.5 degrees. The following double leaf doors were found out of sequencing and prevents the doors from closing" and that "all waste receptacles shall be constructed of non-combustible materials. Waste receptacles located on upper deck (open) were found to be plastic".

i. During the past 36 months, USCG's inspections of the Ferry had led to detentions.

j. In October, 2015, the Ferry was detained in San Juan for three days by the U.S. Coast Guard for three deficiencies related: fire safety measures (international shore connection); crew certificates (certificates of competency) and ship's certificates and documents (safety manning document).

k. Other warnings provided by the US Coast Guard were that the fire extinguishers were not working well.

l. The US Coast Guard found deficiencies on the ceiling sprinklers that stop the flames.

m. Between March and July 2016, the Ferry underwent maintenance work at Europe.

n. Even though defendants informed the public that they would start operating on July 1, 2016, they were unable to provide ferrying service to passengers since the Ferry was still in Europe receiving maintenance.

o. In July 2016, while refueling the Ferry at Port of Gibraltar, prior to continuing across the Atlantic to Puerto Rico, the Ferry was detained for six days related to deficiencies associated to the auxiliary engines.

p. After the alleged repairs at the Port of Gibraltar, the Ferry continued its voyage to Puerto Rico.

q. While in its voyage, the Ferry's engines failed.

r. The ferry was unable to continue its voyage for approximately a day.

s. Due to said mechanical failure, the Ferry changed its journey and traveled to Santo Domingo, Dominican Republic.

t. At the Santo Domingo's Port, the Ferry's engine allegedly was repaired.

u. Early August, 2016, the Ferry arrived at the Port of San Juan, Puerto Rico.

x. During the USCG inspection, it determined that one of three life rafts was working.

y. A USCG inspection early August 2016, found four deficiencies related to fire safety measures and one related to the propulsion and auxiliary machinery.

z. During the August 17, 2016's emergency, the Ferry's life rafts and sliding device were not working properly and/or were not properly installed.

aa. Two of the three life rafts were not working as the Coast Guard required.

bb. At least one life raft got stuck while descending.

cc. The second life raft got stuck while descending to the ocean and when it reached the ocean its engines failed.

dd. This second life raft was rescued by other vessel and/or vessels.

ee. During the voyage from Santo Domingo to San Juan, and while Plaintiff was onboard the Ferry, the air conditioner was not working well and/or was not working at all.

ff. Such was an indication of mechanical and/or electrical failure.

gg. Due to information and/or belief the Fire started at 7.15 am at the machinery room.

hh. The Fire at the Ferry started when the Ferry was near the Thermoelectric in Levittown, PR.

ii. Defendants lack of repair and/or failure to provide proper maintenance to the Ferry and/or failure to properly and immediately repair the deficiencies informed by the USCG on their report dated August 17, 2016, among others, provoked the fire inside the Ferry.

jj. Plaintiff's damages were a direct consequence of defendants' negligence by: (i) failing to provide a safe ferry; (ii) failing to protect the passengers; (iii) failing to maintain safe premises; (d) failing to provide adequate emergency instructions; (iv) failing to hire adequate personnel which were not well trained and/or had lack of knowledge on emergency proceedings and/or had lack of knowledge on descending life rafts; (v) failing to repair and/or properly repair the engine, electric and/or propulsion defects; (vi) Defendants knowing of the Ferry's mechanical, electrical and/or propulsion defects and not repairing it and/or failing to properly repair them; (vii) Defendants breaching their duty of care to Plaintiff to the extent they failed to maintain working properly the life rafts and other safety equipment; (viii) provoking unnecessary delay in the evacuation of the Ferry; (ix) failing to cancel

14

the voyage despite knowing that the vessel was not properly working; (x) operating the Ferry knowing it was unseaworthy due to the defective engines, life rafts, electricity, air conditioners, emergency equipment and procedures. Due to the abovementioned, defendants failed to comply with the Maritime and Admiralty Law of the United States and with the Art. 1802 and 1803 of the PR Civil Code.

kk. Defendants actions and omissions, through fault and/or negligence, caused damages to Plaintiff, in violation of Art. 1802 and 1803 of the PR Civil Code and General Maritime Law entitling plaintiff to damages caused as a result of those acts and omissions and are, thus, jointly liable to Plaintiff.

ll. Defendants' negligence acts were a proximate legal cause of Plaintiff's injury.

## B. SECOND CAUSE OF ACTION – UNSEAWORTHINESS

mm.  Defendants maintained an unsafe place for plaintiff and exposed her to danger while ferrying passengers with a Ferry with serious engine, electricity and propulsion defects and also with the life rafts, mechanical and technical defects, as abovementioned.

nn.  The vessel was unseaworthy and defendants' failed to repair that dangerous situation.

oo.  Plaintiff's injuries occurred as a proximate result of the unsafe and unseaworthy condition of the vessel, which was managed, operated and/or maintained by Defendants. In addition, said injuries were caused in whole as a proximate result of negligence on the part of the Defendants, its agents, servants and/or employees.

## C. THIRD CAUSE OF ACTION AGAINST THE P&I CLUB

pp.  Co-defendants **STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD, THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA), and THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED,** are liable for the negligence, fault, legal violations and unseaworthy conditions of their insured up to the coverage limit.

## VI.    DAMAGES

50.    Plaintiff Álvarez Méndez suffered physical and psychological injuries as a result of the events of August 17, 2016, such as:

    a.    smoke inhalation;

    b.    injuries through her body, particularly to her right leg which was fractured, and resulting impairment;

    c.    psychological injuries for which she is currently suffering symptoms akin to those suffered by patients with PTSD; and

    d.    special damages in the form of expenses incurred, estimated in excess of $5,000.00, and loss of earnings, estimated in excess of $10,000.00

51.    In all, as a result of the injuries suffered by the negligible and culpable conduct of the defendants, Ms. Méndez suffered damages in excess of the sum of $1,500,000.00.

52.    In addition to the foregoing, Ms. Méndez has suffered property damages due to the loss of goods that she had to leave behind in the M/V Caribbean Fantasy, in excess of $1,000.00.

## VII.    JURY DEMAND

53.    Plaintiff demand trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully request that this Court:

    a.  Determine that Plaintiff have suffered damages and that defendants are liable for them;

    b.  Determine the fair amount of damages suffered by plaintiff;

    c.  Enter a judgment in favor of Plaintiff and against Defendants in the amount of the damages suffered by her;

    d.  Award Plaintiff the costs and expenses of this action, including reasonable attorney's fees, and

    e.  Grant such other relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED**

In San Juan, Puerto Rico, this 3rd day of October, 2016.

**I HEREBY CERTIFY** that on this date I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system.

*s/ Humberto Guzmán-Rodríguez*
**HUMBERTO GUZMÁN-RODRÍGUEZ**
USDC-PR 128308
PMB 733
1353 Ave. Luis Vigoreaux
Guaynabo, PR 00966
Tel: (787) 767-7502
Fax: (787) 200-7399
hguzman@grllaw.net